CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
FEB 13 2024
LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| TERESA BOELTE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:22-cv-00127 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| SOUTHSTONE BEHAVIORAL HEALTH, | ) ) | By:  Hon. Thomas T. Cullen United States District Judge |
| | ) | |
| Defendant. | ) | |

In May of 2019, Plaintiff Teresa Boelte ("Boelte") was injured in a workplace accident and, as a result, began receiving workers' compensation benefits. Sometime later, her employer, Defendant Southstone Behavioral Health ("Southstone"), installed a new CEO, Stephanie Knowles, who—Boelte claims—terminated her *because* she was receiving those benefits. She contends the CEO's decision to terminate her violated federal disability protections, the Virginia Human Rights Act ("VHRA") and/or Virginia's public policy against such discriminatory actions (a so-called *Bowman* claim), and Virginia law prohibiting retaliatory discharge. Southstone has moved for summary judgment on Boelte's claims, but because there is a material factual dispute over the reason for the CEO's decision to terminate her, Boelte's discrimination and retaliatory discharge claims will proceed to trial.

    **I.**    **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

Southstone is a residential behavioral health facility for adolescents. Boelte, who is a registered nurse, began working at Southstone in February 2018; approximately three months

later, she was promoted to Director of Nursing. (*See generally* Dep. Teresa Boelte 70:7–14, 72:12–21, Ex. 12, June 28, 2023 [ECF No. 22-1].)

In her new role, Boelte was "to make sure there was staffing at all times at the facility, to ensure that the residents were taken care of, compliance, [and] safety. [She] was in charge of infection control at the time as well." (*Id.* 74:13–16.) The relevant job description also listed other responsibilities, including "[e]nsure nursing services are provided in compliance with the laws and regulations of federal, state, and local government agencies," ensure that "[s]tandards are met for accrediting agencies," and "[o]versee nursing services documentation to ensure it meets all standards." (*Id.* Ex. 11.) From the time she was hired as Director of Nursing until CEO Stephanie Knowles was hired, Boelte did not have any documented employment issues. She did, however, suffer a work-related injury to her lower back in May 2019, for which she qualified for Workers' Compensation. (*See, e.g.*, Pl.'s Br. in Opp. Ex. B [ECF No. 26-2].)

In the summer of 2020, as part of its license to provide Medicare and Medicaid-related services, Southstone was subjected to an "audit" by the Virginia Department of Health. As a result of that audit, Southstone was cited for non-compliance with medication administration and documentation requirements. (Dep. Stephanie Knowles 33:22–25; 34:1–24, Aug. 2, 2023 [ECF No. 22-2].) Although she was not CEO at the time of the audit, as Knowles recalls the citations, Southstone had failed to fulfill a prior "plan of correction" issued by the VDH, and its 2020 citations indicated ongoing deficiencies in those areas. (*Id.* 35:9–14.)

In November 2020, Southstone hired Knowles as its new CEO. Shortly after she started, Knowles and Boelte had a conversation regarding Boelte's duties and how she "shouldn't have had so many roles [at Southstone] because it was too much, so [Knowles] was

- 2 -

going to try to take away" some of her responsibilities. (Boelte Dep. 99:6–9.) They also discussed the restraint procedures and attendant documentation issues at Southstone. Occasionally, for either staff or patient safety, patients need to be restrained. Consistent with state law and licensing requirements, when a patient is restrained, certain procedures must be followed and certain forms must be completed. At the time Knowles came on board as CEO, Southstone was using restraint paperwork that the prior CEO had "put into effect." (*Id.* 99:14–15.) But both Boelte and Knowles recognized that this paperwork was not compliant with applicable regulations. Knowles told Boelte that she "was making changes" to the paperwork, and Boelte reminded her of several of the requirements. (*Id.* 99:16–21.)

At some point after Knowles started as CEO, she, Boelte, and Mary Beth Wilkerson, a Human Resources ("HR") representative for Southstone,[1] met in private following the daily morning staff meeting. (*See* Dep. Mary Beth Wilkerson 18:22–19:5, Sept. 6, 2023 [ECF No. 22-3].) At this impromptu gathering, Knowles asked Wilkerson to provide her with a list of individuals who were on workers' compensation and how long they had been receiving those benefits. (*Id.* 19:15–18.) Apparently, Knowles told Wilkerson that she "needed the list to know who needed to be let go":

> Q     When you said that Miss Knowles said that she needed the list to know who needed to be let go, what do you mean by "who needed to be let go"?
>
> A     That's all she said to me. I took it as to who needed to come off workers' comp or who needed to settle their workers' comp. Who needed to not be a liability.

---

[1] The former HR Director, Danielle Potter, had recently left Southstone and her replacement had not yet been hired. (Boelte Dep. 125:11–15.)

> Q    What do you mean by that?
>
> A    I mean, you know, been on workers' comp for so long. You can look at it in several different ways, but when she said in order to know who to let go, that first thing I thought about what who to let go from employment. Now, who had been on it for so long and who needed to be let go.

(*Id.* 21:11–24.) According to Boelte, Knowles said "corporate" asked for the information and she needed it "to figure out who is going to be staying and who's going to be going." (Boelte Dep. 158:14–17.) Neither Boelte nor Wilkerson know if any such list was ever provided to Knowles. For her part, Knowles does not recall any such conversation and disputes having made any such statements. (Knowles Dep. 72:2–7.)

In December 2020, Knowles completed Boelte's Annual Performance Review. (*See* Boelte Dep. Ex. 12.) In that evaluation, Knowles rated Boelte as "meets" or "exceeds" expectations in every category. Her overall rating, 3.2 out of 5, aligned with a general "Meets Expectations." (*Id.* Ex. 12.) In the comments section of the evaluation, Knowles wrote:

> Teresa has extensive knowledge as a nurse and supports the practices of nursing in the program. She serves as a primary liaison with the psychiatrist. She has been in this role for several years and has worked to develop a nursing team that can meet the needs of the youth and families served by the program. She has served as a primary resource for the organization during the pandemic assuring appropriate supplies and screening/monitoring of staff and youth is in place. As she continues in this role, focus will need to be on assuring that nursing protocols are in place and followed per policy and procedure. This includes the assurance that recent corrective actions related to medication administration and documentation that have been implemented and are sustainable.
> Over the course of the past year the team at Southstone has faced numerous challenges as they relate to the provision of services to youth and families that are evidenced in the issues related to corrective action plans (elopement, client safety, physical plant and provision of services). Teresa will need to continue to focus on identifying and implementing corrective actions and sustainable systems to support the improvements that are needed within the program.

(*Id.*) Knowles signed the evaluation on December 20, 2020. (*Id.* Ex. 12.) But Boelte did not review or sign the evaluation, and Knowles did not discuss it with her. (*Id.* 111:3–9.)

Although Boelte had returned to work after her work-related accident for which she was receiving workers' compensation benefits, in February of 2021 she was forced to undergo back surgery to repair damage caused during that workplace mishap. On February 23, she

applied for medical leave under the Family and Medical Leave Act ("FMLA") until April 2, 2021, which Southstone approved, and underwent surgery.

On or about March 21, 2021, while Boelte was out on leave, Southstone was subject to an unannounced certification survey by the VDH's Office of Licensure and Certification.[2] Following the visit, a written report was prepared, outlining the various conditions that Southstone failed to meet. (*See* Boelte Dep. Ex. 24.) As it relates to the present dispute, during the evaluation, the surveyor noted that Knowles, who had only recently taken the position, was "aware of the failure by the prior CEO to meet regulatory requirements" related to restraining patients, and that "the facility was actively working toward meeting compliance and had revised the restraint policy in February 2021 and made substantial changes (including form changes) to how restraint was documented and carried out beginning March 1, 2021." (*Id.*) Accordingly, the surveyor only reviewed "restraint episodes from March 1, 2021, to March 18, 2021." (*Id.*) Of the 28 episodes of restraint during that period—all of which occurred while Boelte was on leave—"all twenty-eight (28) restraint episodes were deficient in at least one of the areas" reviewed by the surveyor. (*Id.*) Based on these noted deficiencies, Knowles claims that Southstone almost lost its status as a Medicaid provider. (Knowles Dep. 68:14–16.)

On the same date as the VDH survey, Knowles prepared a Performance Improvement Plan ("PIP") for Boelte based on the deficiencies uncovered during the VDH survey. In the explanation section of the PIP, Knowles wrote:

---

[2] Southstone refers to this as the "PRTF Survey," as it is a Medicaid Psychiatric Residential Treatment Facility certification survey.

> **Detailed explanation of the reasons for commendation, feedback, or performance improvement planning:**
> During a review of documentation related to restraints in February 2021, it was discovered that the nursing department was not meeting all required documentation requirements per the CMS Conditions of Participation and corrective actions to address this practice were started by the CEO to address deficiencies with the intention of addressing the concerns with Teresa when she returned from leave. In March 2021, CMS Condition of Participation Survey was conducted at the facility. During the survey, it was confirmed that there were serious deficiencies occurring in the nursing department as they related to nursing functions surrounding restraints. A review of files from 2020 through February 2021 demonstrated that multiple policies that were in place were not being followed by the nursing department for which Teresa is responsible. Without the steps taken in March to demonstrate that plans were in place to address deficiencies that were present under Teresa's leadership, the program would have been in serious jeopardy of losing its status as a Medicaid provider. These issues included not assuring that physician orders were obtained for each restraint that was initiated, assuring that documentation related to the use of restraint was not complete, comprehensive or contained all required elements, and allowing LPN's and CNA's to complete assessments of youth post-restraint which is out of their scope of practice and outside of policy. Review of policies and procedures indicate that there were clear expectations related to restraint and assessment of youth post-restraint that outlined the expectations as related to the Conditions of Participation and Teresa failed to assure that these policies were in place and in practice in her department. Due to the significance of the findings of the survey and the lack of follow through in assuring that policies and procedures were being followed within her department, Teresa will be removed from the Director of Nursing position at Southstone.

(Knowles Dep. Ex. 1.) The PIP was not delivered to Boelte. (*Id.* 52:14–15.) According to Knowles, she did not review the PIP with Boelte because Boelte "was on leave." (*Id.* 41:2–3.)

Although Boelte was originally set to return to work on April 2, because she was still experiencing significant leg and back pain, her physician delayed her return to work at that time. (Boelte Dep. 140:13–15.) As such, Boelte requested to extend her FMLA leave until April 30, which Southstone approved. (*See id.* Ex. 18.) At a follow-up appointment on April 29, Boelte's physician recommended that she extend her leave until at least her next appointment, which was scheduled for June 10, 2021. (*Id.* Ex. 19.) So Boelte requested to extend her leave again. Southstone responded that her FMLA leave would only last until May 12 and that, if she needed additional leave beyond that (to the June 10 date recommended by her physician), she could request it as an accommodation. (*See, e.g., id.* Ex. 21.)

At some point before Boelte's FMLA leave expired, Knowles called her to inquire about her return to work and to ask whether she could come into the office on restricted duty:

> A       Stephanie Knowles had asked me — we were talking on the phone, and she said, Is there any way you can come back early before this.
> And I explained to her what the doctor was concerned about, you know, getting reinjured, and that I just wasn't strong enough to go back as of yet.
> And she said, Well, I really need you down working on the floor with the staff, with the nurses. I just really need you back here on the floor.
> I said, Well, I'm sorry, but I just physically cannot do it at this time.
>       . . .
> She had actually reached out because there was a situation going on about something on campus, and she had a question.
> She had reached out also about the CARF certification. And then the question she said, you know, Is there any way you can come back earlier.

(Boelte Dep. 149:5–17; 150: 7–12.)

On June 3, 2021, Danielle Duffer, Southstone's HR director,[3] sent Boelte a letter indicating that it never received a response to its April 30 request to have her healthcare provider complete a medical questionnaire by May 15 so that Southstone could "assess [her] request for additional leave as a potential accommodation under the Americans with Disabilities Act." (*Id.* Ex. 23.) The letter went on:

---

[3] Duffer was hired while Boelte was on leave. (Boelte Dep. 125:3–10.)

We do not know if your failure to return the requested medical documentation regarding your current leave is because you do not intend or do not believe you will be able to return to work or for some other reason. Please let us know. We cannot continue to hold your position -- particularly given the below concerns -- without knowing your return to work intentions. If you are unable to return to work after your next follow up visit, we will move forward with separating your employment. If you are able to return to work, we will need to discuss whether you can remain in your role as Director of Nursing.

As you know from your most recent annual performance evaluation issued in December of 2020, a critical focus area for you was to insure that "nursing protocols are in place and followed per policy and procedure" and that "recent corrective actions related to medication administration and documentation have been implemented and are sustainable." Disappointingly, during a recent Medicaid PRTF Certification Survey, auditors found numerous nursing deficiencies that placed residents and staff safety in jeopardy and resulted in a significant Plan of Correction. Southstone cannot continue to operate without a Director of Nursing and, in light of the uncertainty of your ability to return and the significant performance issues, intends to start a search immediately in the event that you are unable to return to work and/or unwilling or unable to address and remediate

the performance concerns. To be clear, no decision has been made at this time regarding your continued employment; we simply believe it is prudent to begin our search now.

(*Id.*)[4]

On June 10, Boelte saw her surgeon and was cleared to return to work on June 28. (*Id.* Ex. 28.) On June 23, however, her employment was terminated effective as of her return date. The termination letter gave the following rationale for the decision:

---

[4] Again, as noted above, although the letter stated "[a]s you know from your most recent annual performance evaluation," that evaluation was never shared or discussed with Boelte.

> This letter follows up on my recent correspondence to you regarding your employment status, return to work intentions and significant performance concerns. As I shared with you in my letter of June 3, Southstone had serious concerns about your work performance prior to your leave. For example, as you know from your most recent annual performance evaluation issued in December of 2020, a critical focus area for you was to insure that "nursing protocols are in place and followed per policy and procedure" and that "recent corrective actions related to medication administration and documentation have been implemented and are sustainable." As I shared with you, the recent Medicaid PRTF Certification Survey found numerous nursing deficiencies that placed residents and staff safety in jeopardy and resulted in Southstone implementing a significant Plan of Correction. Those deficiencies included but were not limited to restraint policies, procedures and documentation. For example, the audit revealed that physician orders were not always obtained for each restraint that was initiated, documentation related to the use of restraint was incomplete and non-comprehensive and LPNs and CNAs were permitted to complete assessments of youth post-restraint which is outside of their scope of practice and outside of policy. As the Director of Nursing and the highest clinical officer at Southstone, you were responsible for ensuring compliance in each of these areas.
>
> Based upon those concerns and deficiencies, Southstone has made the decision to separate your employment effective as of your return to work release date of June 28, 2021. Accordingly, you should not report to work on that date. However, we do need you to report to the Manor House on Monday the 28th at 1pm. This way you can to pick your belongings, drop off the following company property laptop, keys, wristband and ID badge. We wish that the decision could have been different but believe that the decision we have made is in the best interest of our patients and nursing staff.

(*Id.* Ex. 31.)

Boelte subsequently filed a charge of discrimination with the Equal Employment Opportunity Commission and received a Notice of Right to Sue on or about September 7, 2022. She filed the present suit on December 5, 2022, asserting claims for disability discrimination, a violation of the VHRA, and retaliatory discharge. Following discovery, Southstone moved for summary judgment on all of Boelte's claims. The matter was fully briefed by the parties, and the court held oral argument on January 9, 2024. At the conclusion of that hearing, the court advised the parties that, while the exact limits of its ruling would be released in a written opinion, at least some of Boelte's claims would survive. For the reasons

discussed herein, her disability discrimination and retaliatory discharge claims must proceed to trial.

## II.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "'[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is

to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### III.   ANALYSIS AND DISCUSSION

A.   <u>Count 1: Disability Discrimination</u>

"To establish a claim of disability discrimination under the ADA, a plaintiff must prove (1) that she has a disability, (2) that she is a qualified individual for the employment in question, and (3) that her employer discharged her . . . because of her disability." *Smith v. CSRA*, 12 F.4th 396, 412 (4th Cir. 2021) (cleaned up). "An employee is qualified if they can perform the essential functions of the employment position they hold or desire, either with or without

reasonable accommodation." *Wirtes v. City of Newport News*, 996 F.3d 234, 238 (4th Cir. 2021) (cleaned up).

> Plaintiffs can prove an ADA claim by direct or indirect evidence or by use of the burden-shifting scheme established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* burden-shifting scheme, the plaintiff must first establish a prima facie case of discrimination . . . . If she does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the termination. If the employer produces enough evidence on this point, the plaintiff must then show why the employer's asserted justification is a pretext for discrimination.

*EEOC v. Loflin Fabrication, LLC*, 462 F. Supp. 3d 586, 599 (M.D.N.C. 2020) (cleaned up).

This is the rare case in which a plaintiff has presented direct evidence of discrimination and, therefore, need not rely to the *McDonnell Douglas* burden-shifting analysis to establish a discriminatory inference. Both Boelte and Mary Beth Wilkerson testified that Knowles asked for the names of individuals on workers' compensation so that she would know "who's going to be going." And Boelte was terminated the day she returned to work from her FMLA leave, during which she was receiving workers' compensation. Taking Boelte's evidence as true, Knowles indicated a desire to terminate those individuals who were receiving workers' compensation benefits and, when Boelte took extended leave for that workplace-related injury for which she was receiving benefits, Knowles terminated her.[5]

At this stage, Southstone's arguments to avoid this conclusion are unpersuasive. First it argues that there is no evidence that any such list was ever produced and given to Knowles,

---

[5] Although the parties focus their arguments on Knowles's alleged request for the names of employees receiving workers' compensation benefits, the court notes that Knowles alleged phone call imploring Boelte to return to work early could support a disability discrimination claim as well. According to Boelte, Knowles told her that she needed Boelte "down working on the floor with the staff, with the nurses," which could suggest that Boelte was terminated because her injury precluded her early return to work. (Boelte Dep. 149:12–15.)

but this is a red herring. Regardless of whether a list was made, Knowles clearly knew that Boelte was receiving workers' compensation and on leave for the injury underlying that claim; in fact, she called Boelte while she was on leave and asked her to either come in to work and/or to terminate her leave early and come back to work. (*See* Boelte Dep. 149:5–17; 150: 7–12.)

Second, Southstone argues that the approximately 6-month time gap between Knowles's alleged statement and Boelte's termination belie any causal connection. But this, too, is unavailing. After Boelte went on leave, Knowles herself admits that she made the decision to terminate Boelte immediately following the March audit, three months before the termination took effect. (*See* Knowles Dep. 63:4–13; 64:7–11, 18–22.) In fact, if Knowles's timeline is to be believed, she made the decision to terminate her on March 24, 2021, approximately one month after Boelte began her leave.[6]

Southstone also disputes that Boelte was a qualified individual for the employment, citing the deficiencies it noted with her work in the June 3 letter and the June 23 termination notice. Again, at this stage and taking the evidence in the light most favorable to Boelte, the record simply does not support this conclusion as a matter of law. First, shortly before her leave, Knowles gave her an Annual Performance Evaluation that rated Boelte as "meeting expectations." In fact, Knowles marked that Boelte "meets" or "exceeds" expectations in *every* category on which she was rated. Southstone relies on the narrative section to contend that

---

[6] Knowles's testimony calls into question Southstone's shifting explanations for its decision. If, as Knowles claims, the decision to terminate Boelte was made at the conclusion of the VDH survey (in March), then why was Boelte informed in the June 3 letter from Southstone's HR director that she *was not* being terminated? (*See* Boelte Dep. Ex. 23.)

Boelte was on notice that she was *not* meeting expectations, but this argument is dubious. It runs counter to the plain language in that evaluation, Boelte was never given a copy of the evaluation, and reading the narrative in the light most favorable to Boelte simply does not paint her performance as unsatisfactory.

Southstone also points to the VDH survey as a "sea change" in its perception of her work. But the issues with "restraints" documented in the VDH survey all concerned a policy that Knowles drafted and implemented while Boelte was on leave. Of course, the regulations were in place long before the new policy was drafted, and Southstone argues Boelte's longitudinal failure to train the staff on those regulations was the overarching problem. But again, Southstone is not entitled to its favored interpretation of the evidence. Rather, the errors cited by the VDH surveyor all apply to issues that occurred while Knowles was overseeing the nursing staff, not Boelte.[7]

At bottom, there is sufficient evidence to support Boelte's position, and a reasonable juror could find that (1) Knowles's request for a list of employees receiving workers' compensation benefits is evidence of animus towards those with actual or perceived disabilities; and (2) as soon as Boelte took leave, Knowles determined to get rid of her for that disability. Likewise, a jury could view the evidence as establishing, contrary to Southstone's present claims, that Boelte was meeting her employer's expectations related to her job

---

[7] To be sure, the VDH surveyor indicated that she reviewed "a sample of restraint episodes over the previous year," and that she met with "the facility management to discuss the restraint process and facility staff's failure to meet the regulatory requirements including but not limited to physicians orders, face-to-face assessment, documentation of monitoring, debriefing, etc." (Boelte Dep. Ex. 24.) The surveyor was informed of changes to procedures that had recently been put into place, so she "concentrated the review on restraint episodes from March 1, 2021 to March 18, 2021. . . . A total of twenty-eight (28) restraint episodes were reviewed and all twenty-eight (28) restraint episodes were deficient in at least one" respect. (*Id.*)

performance at the time she took leave.[8] In other words, material factual disputes preclude summary judgment on Boelte's claim of disability discrimination.

B. Count 2: Virginia Human Rights Act/*Bowman* Claim

Insofar as Boelte asserts a claim of disability discrimination under the VHRA, it must fail as a matter of law. At the time of her termination,[9] that statute did not encompass disability as a protected class. *See, e.g.*, *Wells v. BAE Sys. Norfolk Ship Repair*, 483 F. Supp. 2d 497, 512 (E.D. Va. 2007). Accordingly, she may not proceed under that statute. And for the reasons discussed below, her *Bowman* claim is similarly deficient.

"Virginia adheres to a strong presumption that employment is at will, meaning employment lasts for an indefinite term and can be terminated for almost any reason." *Carmack v. Virginia*, No. No. 1:18-cv-00031, 2019 WL 1510333, at *9 (W.D. Va. Apr. 5, 2019). "However, there is an exception to this doctrine for at-will employees who claim to have been discharged in violation of public policy." *Id.* (citing *Bowman v. State Bank of Keysville*, 331 S.E.2d 797, 801 (Va. 1985)). "The Supreme Court of Virginia has recognized three situations in which a litigant may show her discharge violated public policy[, a so-called *Bowman* claim]: (1) where an employer fired an employee for exercising a statutorily created right; (2) when the public policy is 'explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy' (e.g., 'It is the public policy of the Commonwealth of Virginia that . . .'); and (3) 'where the discharge

---

[8] Although not directly relevant, Southstone's prior CEO wrote Boelte a letter of recommendation in September 2020, further indicating Southstone's satisfaction with her job performance. (*See* Compl. Ex. D [ECF No. 1-4].)

[9] Amendments to the VHRA that took effect on July 1, 2021, made it an unlawful employment practice to discriminate on the basis of disability. *See* 2020 Va. Acts c. 1140 (S.B. No. 868) (eff. July 1, 2021).

based on the employee's refusal to engage in a criminal act.'" *Id.* (quoting *Rowan v. Tractor Supply Co.*, 559 S.E.2d 709, 711 (Va. 2002)).

The parties appear to agree that neither the first nor the third situation is applicable here, and they likewise agree that the VHRA cannot supply the public-policy basis for a *Bowman* claim. *Accord Hice v. Mazzella Lifting Technologies, Inc.*, 589 F. Supp. 3d 539, 553 (E.D. Va. 2022); *Vinson v. City of Richmond*, Case No. 3:22cv698, 2023 WL 4850172, at *7 (E.D. Va. July 28, 2023). Insofar as Boelte seeks leave to amend her complaint to rely on the Virginia Constitution as the source of the public policy required to make out a *Bowman* claim, such an amendment would be futile. *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

The *Bowman* exception is narrow and, "[s]ince *Bowman*, all subsequent Supreme Court of Virginia cases upholding wrongful discharge claims have rested on the basis of *statutes* which, in their text, announce public policies." *Joyner v. Fillion*, 17 F. Supp. 2d 519, 528 (E.D. Va. 1998) (emphasis added). In other words, Virginia courts have never held—as Boelte asks this court to hold—that the Virginia Constitution can provide the required public-policy pronouncement for a *Bowman* claim. As a court in this district has concluded, "it would be 'improper for a federal court, without state law to guide it, to plow new ground in a state law field.'" *Carmack*, 2019 WL 1510333, at *11 (quoting *Clossin v. Morris*, No. 3:05-CV-00039, 2006 WL 1134149, at *4 (W.D. Va. Apr. 24, 2006)). Accordingly, because reliance on the Virginia Constitution is likely insufficient to save Boelte's *Bowman* claim—and that claim is not otherwise supported by law—Southstone is entitled to summary judgment on it.

### C. Count Three: Retaliatory Discharge

Under Virginia law, "no employer 'shall discharge an employee solely because the employee intends to file or has filed' a workers' compensation claim." *Jordan v. Clay's Rest Home, Inc.*, 483 S.E.2d 203, 207 (Va. 1997) (quoting Va. Code Ann. § 65.2-308(A)). "In other words, employers cannot fire at-will employees for filing . . . workers' compensation claims." *Widner v. HSV Holiday LLC*, No. 5:21-cv-00043, 2022 WL 3273810, at *4 (W.D. Va. Aug. 11, 2022). Southstone argues that there is no evidence to show that Boelte was fired "solely" because she filed a workers' compensation claim. But again, Knowles's statement, as testified to by two percipient witnesses, belies this argument. According to both Boelte and Wilkerson, Knowles asked for a list of employees receiving workers' compensation so that she would know "who's going to be going." And after Boelte took leave to recover from surgery for the injury for which she was receiving workers' compensation, she was terminated.

Admittedly, but for Knowles's statement, Boelte's evidence would likely be insufficient to survive summary judgment at this stage. *See, e.g.*, *Jordan*, 483 S.E.2d at 207–08 (finding circumstantial evidence insufficient to show that an employer acted "solely" because the plaintiff filed a workers' compensation claim). By every account, until Boelte took FMLA leave, there was no intention to terminate her, and she had "filed" a workers' compensation claim well before she took the leave to recover from her surgery.[10] But given the clear animus evident in Knowles's statement, it is sufficient, at this stage, to reserve the disputed factual question of her motivation in terminating Boelte for a jury. *See, e.g.*, *Mullins v. Va. Lutheran*

---

[10] Boelte did not assert a claim for retaliation under the FMLA.

*Homes, Inc.*, 479 S.E.2d 530, 533–34 (Va. 1997). Southstone's motion for summary judgment on this claim must be denied.

### IV. CONCLUSION

The animus apparent in Stephanie Knowles's alleged statement makes summary judgment improper on Teresa Boelte's claims of discrimination and retaliatory discharge. Those claims must proceed to trial. But because her *Bowman* claim is not supported by Virginia law, Southstone is entitled to summary judgment on that claim.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 13th day of February, 2024.

>   */s/ Thomas T. Cullen*
>   HON. THOMAS T. CULLEN
>   UNITED STATES DISTRICT JUDGE